UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

RENEE J. CLARK,                              Civil No. 10-4908 (JRT/LIB)

           Plaintiff,

v.

                                         MEMORANDUM OPINION

MICHAEL J. ASTRUE,                                      AND ORDER

           Defendant.

---

Laura S. Melnick, **SOUTHERN MINNESOTA REGIONAL LEGAL SERVICES, INC.**, 55 East 5th Street, Suite 400, St. Paul, MN 55101, for plaintiff.

David W. Fuller, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for defendant.

The Commissioner of Social Security ("the Commissioner") denied Plaintiff Renee Clark's application for disability insurance benefits under Title II of the Social Security Act ("the SSA"), 42 U.S.C. §§ 416, 423. Clark applied for disability insurance benefits because of a combination of physical and mental health conditions that include bipolar disorder, seasonal affective disorder ("SAD"), major depression, and fibromyalgia. On December 11, 2008, Administrative Law Judge Jerome J. Berkowitz ("the ALJ") found that Clark was not disabled within the meaning of the SSA. After exhausting her administrative remedies,[1] Clark sought judicial review of this decision. The case is now before the Court on the parties' cross-motions for summary judgment.

---

[1] Clark sought review by the Appeals Council, which was denied, thus the ALJ's decision is the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.




In a Report and Recommendation ("R&R") filed on January 13, 2012, United States Magistrate Judge Leo I. Brisbois recommended denying Clark's motion, granting the Commissioner's motion, and affirming the Commissioner's decision. Clark filed an objection to the R&R. This Court reviews the challenged portions of the R&R *de novo* under 28 U.S.C. § 636(b)(1)(C) and D. Minn. L.R. 72.2. For the reasons stated below, the Court sustains, in part, Clark's objection to the R&R and will remand Clark's application to the Commissioner. On remand, the Commissioner must seek more information regarding the effect that a workplace environment would have on Clark's impairments and the diagnostic techniques used by Clark's treating psychologist.

## BACKGROUND

### I. CLARK'S DEPRESSION AND MANIC SYMPTOMS

Clark alleges that she cannot work because of a combination of physical and mental health conditions that include bipolar disorder. (Tr. 45-46.) Clark's medical records suggest that she experiences mood fluctuations as a result of her bipolar disorder, causing periods of improvement followed by returns of depression or manic symptoms.[2]

Clark's medical records between 2005 and 2008 have many entries denoting improvements in her mood and energy level. Clark mostly demonstrated a lack of

---

[2] Clark reported to Pamela Lipe, M.S., a licensed psychologist, that, when she stays on medications, she is on a "more even keel" and that she did not have as many panic attacks since taking the drug Clonazepam. (Tr. 277.) Clark reported in the same session, however, significant symptoms from her bipolar disorder, such as stating that "she never knows what mood she is going to be in or when her mood will change." (*Id.*) Lipe did not describe in any detail how Clark's symptoms varied when she was on medication versus not on medication. (*See id.*; *see also* Tr. 327 (describing increased problems when Clark did not take medication).)

depression or manic symptoms[3] on, for example, October 18, 2005 (Tr. 319) (not depressed with "even" mood); November 25, 2005 (Tr. 309) (stable mood but sleeps too much with low energy); January 23, 2006 (Tr. 301) (stable, with no manic symptoms and no persistent depression); January 25, 2006 (Tr. 298) (bipolar disorder seemingly under control); February 16, 2006 (Tr. 292) (absence of excessive depression or anxiety); May 15, 2006 (Tr. 421) (assessed as doing well in terms of mood); August 11, 2006 (Tr. 413) (noting sleepiness and low quality of life due to medications, but that bipolar disorder is much improved); July 7, 2006 (Tr. 418) (no manic symptoms and stable, but low energy, irritability, and excessive sleeping); February 20, 2007 (Tr. 571) (bipolar had been "well controlled with medication for a long time"); March 14, 2007 (Tr. 567-68) (anxiety better, no psychotic symptoms or signs of mania); March 26, 2007 (Tr. 565) ("Renee has come a long way in terms of her stability"); June 6, 2007 (Tr. 558) (depressed and symptomatic but improved); July 12, 2007 (Tr. 555) (doing "ok," although affect dulled with minimal range); August 6, 2007 (Tr. 554) (manic symptoms, but fairly stable); December 12, 2007 (Tr. 549-550) (stable mood, but some "up and down" feelings); January 15, 2008 (Tr. 461-62) (bipolar under control with stable mood); February 26, 2008 (Tr. 546) (irritability subsided, stable mood); July 29, 2008 (Tr 684) (mood cycling is not significant and mood swings remain improved, but sleeping too much and demonstrating a poor memory); March 26, 2008 (Tr. 544) (mood even, but sleeping a lot); March 27, 2008 (Tr. 458) (she has "never felt better"); May 6, 2008

---

[3] On many dates, Clark demonstrated a combination of improvement in some areas and difficulty in other areas.

(Tr. 542) (mood remains stable); May 27, 2008 (Tr. 687) (mood stable, depression improved, but discouraged about pain); August 5, 2008 (Tr. 683) (mood swings remain improved, although she is tired); and August 20, 2008 (Tr. 682-83) (doing relatively well despite physical pain).

On other dates during this same period, Clark's medical records demonstrated emotional instability, such as on April 18, 2005 (Tr. 330) (depression); October 2, 2006 (Tr. 406) (depression); May 25, 2006 (Tr. 420) (tiredness and anxiousness); March 27, 2006 (Tr. 287) (tiredness, depression, and inability to concentrate, along with chronic pain and sleeping too much); November 20, 2006 (Tr. 576) (increase in anxiety, but improvement in tiredness); January 8, 2007 (Tr. 574-75) (tiredness and anxiety); June 18, 2007 (Tr. 557) (depression and irritability for past two to four weeks and mild hypomanic symptoms); June 20, 2007 (Tr. 556) (depression after week of reported manic symptoms); October 9, 2007 (Tr. 552-53) (increased anxiety, flat affect with minimal range, but "coping ok with stressors"); November 19, 2007 (Tr. 551) (manic feelings for a week and a half); December 4, 2007 (Tr. 550) (depression); December 12, 2007 (Tr. 549-50) (ups and downs in mood, possibly due to medication); January 14, 2008 (Tr. 548) (depressed, sleeping a lot); February 6, 2008 (Tr. 547) (irritable, revved up, mood fluctuating); March 10, 2008 (Tr. 545-46) (more "cycling," urge to spend money, low energy, irritability, feels "mixed up," mood swings); March 13, 2008 (Tr. 545) (mood fluctuations, low energy, irritable); April 16, 2008 (Tr. 543) (more frequent panic attacks); April 16, 2008 (Tr. 608) (more cycling, low energy, depression, anxiety, and excessive sleep); April 28, 2008 (Tr. 542-43) (more anxiety and panic attacks, but

improvement in mood swings); June 17, 2008 (Tr. 685) (mood fluctuation); and September 9, 2008 (Tr. 682) (increase in irritability and need for sleep and unstable mood). In summary, Clark's medical records suggest that she experienced periods of depression and manic symptoms. It also appears that, when faced with stressors, Clark often experienced depression or other negative reactions.[4]

## II.     CLARK'S LEVEL OF FUNCTION

The level of function demonstrated by Clark varies in the record, which may be related to her moods. On an average day, Clark "get[s her] son off to school by 7:00" and sits at the computer for a while before taking a long nap. (Tr. 42-43.) She talks to her son about his day when he comes home from school. (Tr. 43.) Sometimes, depending on how she feels, Clark makes dinner for her son and cleans the house. (*See* Tr. 43, 45.) In the evenings, Clark usually chats on her computer until 9:30 PM, takes her medications, and goes to bed. (Tr. 43.)

The record demonstrates that, on certain occasions, Clark enjoys going out to eat, throwing darts, cross-stitching, reading, chatting online, and going to the pool in the summer. (Tr. 43-44, 276.) Clark testified that she "rarely" engages in at least some of

---

[4] *See, e.g.,* Tr. 330 (depression after a flare-up of her son's emotional problems), 406 (signs of depression after an encounter with a former partner), 552 ("coping OK with stressors" after hospitalization of her son, although her anxiety level increased and she spent many hours a day in bed), 548 (coping adequately with financial stressors, although stressed, more depressed, and sleeping a lot), 545 (more mood fluctuation, low energy, excessive sleep, and irritability after breakup with significant other), 574 (angry, tired, and having trouble sleeping after argument with friends), 682 (more symptoms and mood fluctuation, including depression, irritability, and excessive sleeping, after stressful events involving personal relationships); *but see* Tr. 683 (mood swings remain improved despite bringing her mother to the hospital for dehydration), 685 (better feelings about a conflict with a friend that had stressed her the previous day).

these activities, however, depending on her symptoms. (Tr. 43-44.) Clark claims that she sometimes becomes very depressed, stops showering, "become[s] like a recluse," and wears her pajamas around the house for days at a time. (Tr. 51.)

There is mixed evidence about Clark's ability to get along with others. Clark has friends, but also has altercations with friends and other individuals.[5] In the past, Clark has experienced conflict with co-workers. (*E.g.*, Tr. 341.)

Clark sometimes engages in productive activities. She assisted a friend in starting a business by helping her to create brochures and business cards. (Tr. 276.) Clark also takes trips to local grocery and department stores, shares a car with her mother, and is capable of using public transportation. (Tr. 52, 599.)

Clark travels from Minnesota to California for Xena Conventions every year. (Tr. 408, 574.) Attending Xena Conventions is important to Clark; a doctor once observed "[t]he only thing she is looking forward to at this time is her next trip to Calif. in January which gives her a great deal of satisfaction." (Tr. 285; *see also* Tr. 408, 571, 575.) Clark also took a road trip from Minnesota to New Jersey for a vacation. (Tr. 566, 568.)

A great deal of evidence shows that Clark sleeps excessively, including taking long naps. (*E.g.*, Tr. 43, 49, 287, 341, 343, 545.) The record also contains

---

[5] *See, e.g.*, Tr. 341 (Clark had a physical and verbal altercation with a stranger, a physical altercation with her son's father, a history of being verbally assaultive with friends, and difficulty accepting constructive criticism), 555 (Clark had a friend staying with her for a short period of time), 571 (Clark had friends who she saw about twice a month), 574 (Clark had a "very big loss" regarding some close friends who had stopped talking to her); 599 (Clark had many friends and family, but found it hard to meet new people), 644 (Clark experienced irritability and lack of comfort in group settings).

documentation of Clark's tiredness, low energy, difficulty concentrating, and impulsive spending. (*E.g.*, Tr. 51, 341, 545, 550, 567-68, 646.)

At Clark's administrative hearing, her Adult Rehabilitative Mental Health Services ("ARMHS") worker, Kristine Hillman, testified that she visited Clark for ninety minutes each week to focus on self-care and household tasks. (Tr. 29.) Hillman testified that Clark's kitchen was constantly filthy, with piled up trash, food on the floor, and dirty dishes. (Tr. 30.) Hillman stated that Clark's ability to keep up her house depended somewhat on her mood cycle. (*Id.*) She reported that Clark often did not have energy, and that Clark frequently experienced manic and depressive episodes that made it difficult for her to function. (Tr. 29-30.) Specifically, Hillman stated that Clark will go "a week or two of being really down, sleeping a lot, not wanting to cook dinner at all, not caring about the house and then the next weeks, she's, all she can think about is getting the house cleaned . . . ." (Tr. 34.)[6] She stated that Clark was often very sleepy and "the conversation ha[d] to keep moving or [she was] asleep." (*Id.*) Hillman described an incident where Clark took her son to the mall for testing at a clinic and Clark cut the testing short because it was "too much" for her, mentally, to wait for her son. (Tr. 37.) Although Hillman's notes sometimes indicated that Clark's house was clean and that Clark desired to manage her household without assistance, her notes also frequently describe – sometimes in the same reports – Clark's problems with caring for herself and

---

[6] *See also* Tr. 45 ("When I get the energy to, I clean."), 418 (Clark did "not have much interest in housekeeping lately . . . [and had] fallen behind.").

her home.  (*See, e.g.*, Tr. 612, 614, 619-21, 638, 640, 644, 646, 648 (noting setbacks and difficulties identified by Hillman).)

Occupational Therapist Barbara Johnson confirmed Hillman's observations when conducting a visit of Clark's home in May 2006.  Johnson noted numerous hygienic problems with Clark and her home, such as an "odor of vomit" in the home and pans coated with leftover food from weeks earlier.  (Tr. 343.)  Johnson concluded that Clark had deficits in the following areas: physical ability, bathing skills, personal hygiene skills, management, shopping and purchasing skills, time management, planning and decision-making, and social skills.  (*Id.*)

### III.   CLARK'S GAF SCORES

Clark has received several Global Assessment of Functioning ("GAF") scores. "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting Diagnostic and Statistical Manual of Mental Disorders, at 32 (4th ed. Am. Psychiatric Ass'n 1994) (DSM-IV)).  "[A] history of GAF scores at 50 or below, taken as a whole, indicate [the claimant] has '[s]erious symptoms . . . or any serious impairment in social, occupational or school functioning . . . .'"  *Id.* (quoting DSM-IV at 32).

Clark's treating psychiatrist from October 2005 to July 2008 was Diane Dahl, M.D.  In October 2005, Dr. Dahl gave Clark a GAF score of 50.  (Tr. 319-20.)  On April 16, 2008, Dr. Dahl gave Clark a lower GAF score of 45.  (Tr. 607.)  In arriving at

the score of 45, Dr. Dahl indicated, among other matters, that Clark felt her moods were cycling more and that she had low energy and slept excessively. (Tr. 608.) On February 20, 2007, Clark received a GAF score of 50 from Mary McCauley, MSW, LICSW. (Tr. 572.)

Clark received higher GAF scores from Richard Rodgers, Ed.D., L.P. (Tr. 661.) Rodgers gave Clark a GAF score of 70 on March 19, 2007, up from an earlier score of 55. In giving Clark a score of 70, Rodgers noted that Clark was "moderately stable" with less problems than in the past but still times when she "freak[ed] out." (Tr. 659.) He stated that Clark struggled about fifty percent of the time with depression, fatigue, problems with housekeeping, and keeping up personal hygiene. (Id.)[7]

### IV. OPINION OF TREATING PSYCHOLOGIST

Clark received treatment from Kimberly Ryan, M.A., L.P., from May 24, 2007 until at least the time of her administrative hearing. (Tr. 559.) By her hearing date, Clark had seen Ryan twice a month, for a total of twenty-four sessions. (See Tr. 731.) Neither Clark nor any other doctor or psychologist with a specialty in mental health testified at Clark's hearing.[8] Ryan, however, submitted a letter to the ALJ. (See id.)

---

[7] Clark argues that Rodgers' description of Clark is not consistent with a GAF score of 70. Clark also claims that Rodgers' purpose in filling out the form was to authorize ARMHS services for her. A requirement of such services is that a person has "substantial disability and functional impairment in three or more [functional] areas" so that "self-sufficiency is markedly reduced." Minn. Stat. § 256B.0623, subd. 3(3).

[8] The ALJ called only a physical medicine expert, John LaBree, M.D., to testify about Clark's fibromyalgia. (See R&R at 23, 31.) The ALJ prohibited Clark's attorney from asking Dr. LaBree questions about Clark's mental health.

Ryan's letter stated that she diagnosed Clark with the mood disorder Bipolar I, with a seasonal aspect, with the most recent episode depressed. (*Id.*) Ryan stated that Clark took her medications but "continue[d] to experience symptom breakthrough." (*Id.*) According to Ryan, depressive episodes caused severe impairment to Clark's memory and concentration. (*Id.*) Ryan also noted that Clark's depressive episodes worsened in the winter, which resulted in a significant increase of lethargy and excessive sleeping. (*Id.*) In addition, Ryan stated that Clark had "periodic episodes of hypomanic symptoms" that caused her to be impulsive, exhibit impaired judgment, and increase irritability to a level sufficient to cause interpersonal problems. (*Id.*) Ryan believed that Clark would not be able to secure and sustain employment due to "mood instability, adhedonia, concentration and memory impairment, as well as severe chronic fatigue." (*Id.*) She further stated that the demands of a job, such as being present at a certain time every day, would be very likely to trigger mood instability and a recurrence of active panic symptoms. (*Id.*) According to Ryan, Clark "[wa]s functioning at her baseline level of functioning and . . . not likely to experience further improvement." (*Id.*)[9]

In addition to Ryan's letter, the ALJ received copies of medical records authored by Ryan. It appears from these records that Ryan used her own observations of Clark,

---

[9] The R&R described the medical opinions of other mental health professionals such as Lipe, R&R at 10-12, Sharon Frederiksen, Ph.D., L.P., a state agency reviewing psychologist, R&R at 13-14, and Owen Nelsen, Ph.D., L.P., another state agency reviewing psychologist, R&R at 14. These professionals determined that Clark's psychological problems were less severe than her treating psychologist asserted. (*See* Tr. 275-80, 361-63, 424-26.) Lipe met Clark only once, and Frederiksen and Nelson merely reviewed Clark's records. (*See* Tr. 279-80, 361, 425.)

events described by Clark, and Clark's statements about her feelings to diagnose and treat Clark.[10] *See* 20 C.F.R. § 404.1528. Ryan's notes frequently included her own perceptions of Clark, such as noting that Clark's "affect [was] blunted" and that Clark was "somewhat irritable." (*See* Tr. 545.)

## V. ALJ'S DECISION

On December 11, 2008, the ALJ determined that Clark was not entitled to Social Security benefits. (Tr. 9-19.) In doing so, he failed to grant controlling weight to Ryan's opinion and found that Clark did not possess a disability under the SSA. The ALJ's decision is described in more detail below.

## ANALYSIS

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party demonstrates that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable

---

[10] In addition to Ryan's personal observations of Clark, the record contains other "observable facts that can be medically described and evaluated[,]" 20 C.F.R § 404.1528, such as Hillman and Johnson's observations of Clark's hygiene and housekeeping. It is unclear if Ryan had access to such information when arriving at her opinions.

inferences that can be drawn from those facts. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. STANDARD OF REVIEW UNDER SOCIAL SECURITY ACT

### A. Definition of Disability

"The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992); *see also* 42 U.S.C. § 1382(a). The claimant has the burden of persuasion to prove that she is qualified for social security benefits. *Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)) (describing the burdens of persuasion and production under the SSA)).

"Disability" under the SSA means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be eligible for benefits, an individual's impairments must be of "such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner follows a five-step sequential analysis to determine whether a claimant is disabled, considering (1) whether the claimant has engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the

claimant's impairment meets or equals a listed impairment; (4) whether the claimant has sufficient residual functional capacity ("RFC") to return to her past work; and (5) whether the claimant can do other work existing in significant numbers in the regional or national economy. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). A "listed impairment" is an impairment set out in SSA regulations. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).[11] A claimant is considered disabled if she suffers from a listed impairment or a disorder that is the medical equivalent of a listed impairment. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii), 404.1526, 416.926. In addition, a claimant is considered disabled if she lacks the RFC to conduct work on a sustained basis due to her impairments. *Id.* §§ 404.1545, 416.945.

### B.  Substantial Evidence on the Record as a Whole

The Court's review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Minor v. Astrue*, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). Reweighing the evidence is not permitted. *Flynn v. Chater*, 107 F.3d 617, 620

---

[11] Clark asserts that she has an "affective disorder," which is a listed impairment. To possess an affective disorder, a claimant must demonstrate "[m]edically documented persistence, either continuous or intermittent" of symptoms of depression, manic syndrome, or bipolar syndrome, as well as certain functional limitations. 20 C.F.R. pt. 404, subpt. P, App. 1, 12.04. Alternatively, a claimant can demonstrate, among other requirements, that she has "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. . . ." *Id.* Clark further asserts that her impairments medically equal listings 12.04 (affective disorders), 12.06 (anxiety related disorders), and 12.07 (somatoform disorders).

(8th Cir. 1997). Therefore, even if a claimant's impairments support a claim for disability insurance benefits, the Court must affirm if there is substantial evidence to support the Commissioner's conclusion to the contrary. *See id.* This Court cannot reverse the Commissioner's decision "merely because substantial evidence exists in the record that would have supported a contrary outcome." *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). However, "[t]he substantial evidence test . . . requires more than a mere search of the record for evidence supporting the Secretary's finding; review of the Secretary's decision must also take into account whatever evidence in the record fairly detracts from its weight." *Brock v. Sec'y of Health and Human Servs*, 791 F.2d 112, 114 (8th Cir. 1986).

### C. Treating Psychologist's Opinion

Generally, the opinion of a treating source such as Ryan must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (alteration and internal quotation marks omitted) (citing 20 C.F.R. § 404.1527(d)(2)). The weight given to a medical opinion is governed by several factors including the examining relationship, the treatment relationship, the consistency of the opinion with the record as a whole, and the source's specialization. *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). SSA regulations call for a court to give greater weight to treating sources where there is long-term and frequent contact with the claimant. *Id.* "When the treating source has seen [the

claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the court] will give the source's opinion more weight than [it] would give it if it were from a nontreating source." 20 C.F.R. § 404.1527(d)(2)(i). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the Commissioner] will give that opinion." *Id.* § 404.1527(d)(3).

For a treating psychologist's opinion to be entitled to controlling weight, the psychologist must use laboratory findings or other medically acceptable clinical diagnostic techniques to observe signs of specific "anatomical, physiological, or psychological abnormalities" such as "abnormalities of behavior, mood, thought, memory, orientation, development, or perception." *Id.* § 404.1528(b). The signs must be "observable facts that can be medically described and evaluated" and not based solely on a claimant's statements about her symptoms. *Id.*

The Commissioner can reject a treating source's opinion when, by looking at the record as a whole, there is substantial evidence to discount the opinion's validity. *Pope v. Bowen*, 886 F.2d 1038, 1041 (8th Cir. 1989). A treating's physician opinion is also not entitled to controlling weight where it is conclusory, *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991), where other medical assessments are supported by better or more thorough medical evidence, or where the physician renders inconsistent opinions that undermine her credibility, *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). Furthermore, while the treating source's opinions may be entitled to controlling weight on medical matters, her opinion does not control the issue of whether a claimant is

"disabled" or "unable to work," which is an issue reserved for the Commissioner. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).

If the Commissioner limits the weight of a treating source's opinion, the Commissioner "must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Prosch*, 201 F.3d at 1013 (quoting 20 C.F.R. § 404.1527(d)(2)). Furthermore, because a social security hearing is a non-adversarial proceeding, the Commissioner has a duty to fully develop the record independent of the claimant's burden in the case. *Ellis*, 392 F.3d at 994. This duty may include re-contacting a physician for additional information.[12] *See Snead v. Barnhart*, 360 F.3d 834, 838-39 (8th Cir. 2004). The duty to re-contact a physician only arises, however, if a crucial issue is undeveloped. *Ellis*, 392 F.3d at 994; *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### III. ALJ'S DECISION

The ALJ determined that Clark was not entitled to Social Security benefits. (Tr. 9-19.) The R&R contains more thorough description of the ALJ's five-step sequential analysis. *See* (R&R at 20-24); 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). The Court will describe here only those aspects of the ALJ's decision critical on remand.

---

[12] 20 C.F.R. § 404.1512(e) ("When the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision . . . We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source.").